## SHELL PETROLEUM CORPORATION et al. v. TOWN OF FAIRFAX.

No. 26601. June 16, 1937.

Hamilton & Howard, S. N. Hawkes, and Redmond S. Cole, for plaintiffs in error.

Walter L. Gray, D. E. Foley, Snyder & Lybrand, John L. Arrington, and Ralph A. Barney, for defendant in error.

RILEY, J. This is an appeal from a judgment entered in the district court of Osage county in favor of the town of Fairfax, plaintiff below, against the Shell Petroleum Corporation and other oil operators and refiners operating in the watershed of the Arkansas river above the town of Fairfax, for damages for pollution of the water supply of the town of Fairfax. The parties will be referred to as in the trial court.

Since about 1911, plaintiff had been obtaining water for its municipally owned waterworks from a well located some three miles west of the town in the Arkansas river

bottom, and about one-fourth to one-half mile from the river.

In 1910, plaintiff instituted proceedings in the district court of Osage county to condemn one acre of land belonging to Pearl McKinley, a full-blood incompetent Osage Indian, then about four years of age.

In said proceedings commissioners were appointed and appraised the damage at $30. This sum was deposited with the clerk of the court, for the Indian minor, but was never claimed by nor paid to her.

Thereafter, in 1911, plaintiff sunk a well in the one acre of land, and from that time to about 1933, obtained its supply of water for the town from said well.

June 9, 1934, this action was commenced. Plaintiff alleged that defendants had cast salt water, acids, oil, and other pollutive substances into the Arkansas river and some of its tributaries entering said stream above the town of Fairfax, which poisons and pollutive substances permeated the banks and adjacent water-bearing sands along the banks and in the bottom lands along said stream, and finally found its way into the water-bearing sands within the land from which plaintiff obtained its water supply, and polluted and poisoned the water therein so as to render it wholly unfit for human consumption, and unfit for other uses, such as watering lawns, etc., and wholly and permanently destroyed plaintiff's water supply; that by reason thereof it became necessary for plaintiff to obtain a temporary supply of water, until a permanent supply could be obtained at an estimated cost of $30,000, and that it also became necessary to obtain a new permanent water supply by erecting a dam on a creek some 4½ miles west of said town together with a suitable filtration plant at an estimated cost of $200,000. Judgment in the sum of $230,000 was asked.

Separate answers were filed by the defendants, which, in substance, alleged that the waters of the Arkansas river had never been suitable as a municipal water supply; that the plaintiff had never had an adequate supply of water; that other wells could be sunk from which could be obtained an adequate supply as suitable as the town had enjoyed, at a cost of $30,000, or less; that if it become necessary to obtain a surface supply by erecting a dam and constructing a reservoir, a suitable supply at a place suggested by defendants could be obtained at a cost not in excess of $55,000.

It was also alleged that the pollution complained of by plaintiff had occurred more than two years before the action was commenced and therefore the action was barred by the statute of limitations.

The right or power of the town of Fairfax to condemn the land in question was also challenged upon several grounds.

The cause was tried' to a jury, resulting in a verdict and judgment for plaintiff in the sum of $85,000.

From this judgment defendants appeal by joint petition in error.

The petition in error contains 62 specifications of alleged error, which are presented under six propositions.

The first proposition is that the plaintiff is not and never was the owner of the land on which the water well is located, and having no ownership, it acquired no right to place the well thereon, and consequently had no right to recover damage for the destruction of the well.

Under this proposition it is first contended that in 1910 and 1911, there was no constitutional or statutory provision in Oklahoma by which an incorporated town could condemn land on which to drill a water well.

Defendants concede that under section 759, Stats. of Oklahoma 1893, towns were given power and authority to dam any river or stream not navigable, and to condemn, appropriate, and divert the water therefrom or such part as might be deemed necessary, etc. But said section also provided that the city council of cities or the board of trustees of towns and villages should have power and authority to condemn and appropriate in the name of and for the use of the city, town, or village such land or lands, located in or outside the corporate limits thereof, as might be necessary for the construction of its water-works.

Said section also set forth the procedure deemed appropriate to effectuate the condemnation of such property. The proceedings were not set out in full therein. After providing for the appointment of commissioners the section provided: "All proceedings of such commissioners shall be governed by the provisions of sections 27, 28, 29, 30, and 31, of art. 9, ch. 18, of the Stats. of Oklahoma, as far as the same are applicable.* * *"

328

Counsel for defendants argue that the reference to sections 27 to 31, inclusive, of art. 9, ch. 18, of the Statutes of Oklahoma, meant sections 27 to 31 of art. 9, ch. 18, of the Statutes of Oklahoma of 1893, and that since article 9, ch. 18, of the Statutes of 1893, dealt with matters connected with probate procedure, and were wholly foreign to any matters connected with the exercise of the power of eminent domain, there was no procedure whatever provided for the completion of the proceedings after commissioners were appointed, and, therefore, there was no way in which a town could effectively condemn under the powers given by the first part of the section.

The contention that the reference was to certain sections of the Statutes of 1893 is untenable for two reasons.

First: At the time the law of which section 759, supra, became a part was enacted, the Statutes of 1893 had not been published. Second: Article 9, ch. 18, of the Stats. of 1893, as afterwards assembled and published, did not contain as many as 27 sections. That article contained only eleven sections. At the time said law was enacted the Statutes of 1890 were the only compiled and published statutes of the territory. Article 9, ch. 18, of the Stats. of 1890, did contain sections numbered to 31. Sections 27 to 31 thereof dealt with procedure for condemnation of land, etc., by railroad corporations.

The reference was clearly to sections 27 to 31, inclusive, of article 9, ch. 18, of the Stats. of Oklahoma of 1890. Article 9, ch. 18, Stats of 1890, later became article 9, ch. 17, Stats. of 1893, which in turn, with certain amendments adopted in the meantime, became a part of article 9, ch. 20, Snyder's Compiled Statutes 1909, and still later, with revision and amendments, became a part of article 13, ch. 15, Rev. Laws 1910.

Therefore, power to condemn by towns and the necessary procedure were fully provided by section 759, supra.

Such was the law down to statehood. Defendants contend, however, that section 759, Stats. 1893, was not carried over by section 2, of the Schedule to the Constitution.

This is true in part only. That part of the section relating to procedure was repugnant in part to section 24, art. 2, of the Constitution, relating to taking or damaging private property for public use,

in that said section required reasonable notice before appointment of commissioners; that the commissioners be selected from the regular jury list. But that part of the section which conferred power upon cities and incorporated towns to condemn and appropriate lands, water, etc., for waterworks purposes was not in conflict with nor repugnant to any provision of the Constitution, was not locally inapplicable, and was by the provisions of section 2, of the Schedule extended in force in the state of Oklahoma until altered or repealed by law.

That part of the section dealing with procedure in so far as it was in conflict with or repugnant to the Constitution, was not extended. This left the power given, but ineffectual until a proper procedure was provided. This was provided by the adoption of section 1, art. 1, ch. 20, S. L. 1907-8. That section amended section 28, art. 9, ch. 17, Stats. of 1893 (art. 9, ch. 18, Stats. 1890), so as to provide procedure to conform to the requirements of the Constitution. That section, while dealing primarily with procedure in eminent domain by railroads, was also made to apply to all corporations having the right of eminent domain. The last paragraph of said section reads in part: "Provided, that the provisions of this act shall apply to all corporations having the right of eminent domain."

The power of a town to exercise the right of eminent domain having been brought over and extended by section 2 of the Schedule to the Constitution, this section provided the necessary procedure. Therefore the town of Fairfax in 1910 and 1911 had constitutional and statutory power to condemn land for waterworks purposes.

The fact that towns were omitted from section 4, art. 1, ch. 20, S. L. 1907-8, did not take away such power of incorporated towns. Section 4, supra, merely purports to confer power upon counties, cities, etc., not mentioning towns, to condemn lands for highways, rights of way, building sites, cemeteries, public parks, and other public purposes. Cities and towns already had the power and authority to condemn for waterworks purposes. This power was not taken away from towns by failure to include them in section 4, giving power to condemn for other purposes.

It is next contended by defendants in their original brief and their reply brief that even though it be granted that the

town had power to condemn non-Indian land, the power did not extend to the right to condemn land allotted to a restricted Osage Indian.

In this connection reference is made to a paragraph of section 3 of the Act of Congress of March 3, 1901 (1931 Stat. L. 1084), which provides:

"Lands allotted in severalty to Indians may be condemned for any public purpose under the laws of the state or territory where located in the same manner as land owned in fee may be condemned and the money awarded as damages shall be paid to the allottee."

In view of a letter purporting to be from the Commissioner of Indian Affairs and approved by the Secretary of the Interior, dated December 24, 1936, relating to other condemnation proceedings had in the district court of Osage county involving allotted Osage Indian land, in which the above provision of the act of Congress is quoted, and in which the commissioner says, "This law applies to Indian allotments generally, and authorizes condemnation for public purposes under the laws of the state or territory where located," the defendants in a supplemental brief filed May 21, 1937, apparently recede from the position first taken that said provision did not apply to allotted Osage Indian land. They now contend that if this may be done, the United States is a necessary party and the proceedings cannot be had in a state court, but must be taken in a federal court.

With these contentions we cannot agree. The act of Congress quoted above, granting authority to condemn lands allotted in severalty to Indians, says that such lands may be condemned under the laws of the state or territory where located. This means the land may be condemned under the provisions of the law of the state or territory where located. If the law of such state or territory authorizes a town to condemn land, it may be condemned only for such purposes as the law of the state or territory may provide. It may be condemned in the same manner. That means the same court and under the same procedure as would be the case if the land were owned in fee. If the land is owned in fee, the state court has power and jurisdiction to condemn. That act confers like authority as applied to allotted Indian land. Likewise if the land is owned in fee, the owner is

the only necessary defendant. The allottee is the only necessary defendant in the condemnation of lands allotted in severalty to an Indian. Since the United States may not be sued without its consent, and no consent is given by the act, it must be assumed that Congress intended to permit the condemnation of such land without making the United States a party.

Other propositions are presented going to alleged defects in the condemnation proceedings which it is claimed rendered the same void on the face thereof. But we deem it unnecessary to go extensively into these questions.

The record in this case shows that the plaintiff went into possession in 1911 after the condemnation proceedings, placed its improvements thereon, devoted the land to a public use, and uninterruptedly enjoyed and used the land, without objection from any source for a period of more than 21 years.

In City of Seminole et al. v. Fields, 172 Okla. 167, 43 P. (2d) 64, it is held:

"Where a city, vested with the power of eminent domain, enters into actual possession of land necessary for its corporate purposes, with or without the consent of the owner, and the owner remains inactive while valuable improvements are being constructed in close proximity to the property, the use of which improvements require a continued use of land, and the owner thereafter brings an action for damages to recover the total value of the land, the appropriation will be treated as equivalent to title by condemnation."

Under the facts in this case, the appropriation of the land in question, and the percolating water thereunder, for the public purpose shown by the record, the appropriation will be treated as equivalent to title by condemnation. Defendants are therefore in no position to raise question of defects in the proceedings.

Plaintiff contends that it was unnecessary for the town to allege and prove title in order to maintain this action; that its possession alone was sufficient as against strangers. Having held, however, that the town had right and power to condemn, we deem it unnecessary to discuss the rights of the town as based upon mere possession.

The next proposition is that the Arkansas river and its underflow of water was unfit for municipal use more than two

years prior to the institution of this action, and that plaintiff's action was, therefore, barred by the statute of limitations.

This was a question of fact upon which the evidence at most was in conflict.

The jury was instructed that the burden was upon plaintiff to prove by a preponderance of the evidence that defendants polluted the waters of the Arkansas river; that the pollution of the waters of the river was a natural and continuous result of the acts of defendants unbroken by any independent cause, and reached the well which was the water supply of the plaintiff; that the pollution first reached said well, unaided by any act of plaintiff or any other independent cause, subsequent to the 8th day of June, 1932. The action was commenced June 9, 1934. The verdict of the jury determined this controverted question adversely to the contention of defendants.

The next contention is that plaintiff was not entitled to recover a sum in excess of an amount necessary to supply the town with a well or wells which would supply water equal in quantity, quality, and dependability to that which it had on June 9, 1932.

That is the rule stated in Roxanna Petroleum Corp. et al. v. City of Pawnee et al., 155 Okla. 141, 7 P. (2d) 663. Here, as in that case, defendants contended that an adequate and enduring supply of water of similar quality, quantity, and dependability could be obtained by sinking another well or wells farther from the river bank, at a cost not to exceed $30,000, and still another supply of like kind could be obtained by the erection of a dam in a creek other than that proposed by defendant at a cost of not to exceed $55,000. Evidence for and against the feasibility of these projects was presented to the jury. The question was submitted under an instruction fairly stating the law, first presenting the well project. The jury was told that if it should be found that the well or wells proposed by defendants would produce a supply of water equal in quality, quantity, and dependability as that enjoyed by the town on June 8, 1932, the verdict for plaintiff, if any, should not exceed $30,000, the estimated cost. The jury was then told that if the well project was found insufficient, then the other project suggested by defendants should be considered and the verdict; if any, should not exceed the cost thereof, plus reasonable and necessary excess cost of the operation thereof.

The verdict of the jury was against the well supply, and against the surface supply contended for by defendants, at least as to cost thereof, and since there was evidence reasonably tending to support its finding in this regard, it will not be disturbed.

The next contention is that the conduct of the attorneys for plaintiff was such as to deny the defendants a fair trial.

The contention as applied to alleged improper questions propounded to witnesses is entirely without merit.

As to remarks made by counsel for plaintiff wherein defendants were referred to as sons of a well known and highly successful pioneer in the oil and refinery business, the objection of counsel was promptly sustained and the remarks were withdrawn from the consideration of the jury, and counsel for plaintiff in effect apologized and asked the jury to forget the remarks. Under the record it could not be said that the jury was in any way prejudiced or influenced by the remarks of counsel.

The remaining proposition goes to the question of sufficiency of the evidence to sustain the verdict, alleged error in giving certain instructions, and in refusing certain instructions offered by defendants.

The instructions given follow closely the rule laid down in the case of Roxanna Petroleum Co. v. City of Pawnee, supra. We find no error in the instructions given. They fairly covered the law as applicable to the pleadings and evidence.

There was likewise no substantial error in refusing instructions offered by defendants.

We find no substantial error, and the judgment is affirmed.

OSBORN, C. J., BAYLESS, V. C. J., and BUSBY, WELCH, PHELPS, and HURST, JJ., concur. CORN, J., dissents. GIBSON, J., absent.