# BROOKS INVESTMENT COMPANY v.
# CITY OF BLOOMINGTON.

232 N. W. 2d 911.

September 5, 1975—No. 45321.

*Gary Gandrud,* City Attorney, and *Cynthia Hovden Albright* and *Eric R. Berg,* Assistant City Attorneys, for appellant.

*Dorsey, Marquart, Windhorst, West & Halladay, David A. Ranheim,* and *Peter S. Hendrixson,* for respondent.

Heard before Peterson, Todd, and Knutson, JJ., and considered and decided by the court en banc.

KNUTSON, JUSTICE.*

This is an appeal by the city of Bloomington (hereafter referred to as the city) from a summary judgment entered in Hennepin County District Court in favor of Brooks Investment Company.

Brooks Investment Company, a partnership composed of Harry Brooks, Dora Brooks, and Sheldon Brooks, (hereafter

---

*Retired Chief Justice acting pursuant to Minn. St. 2.724.

referred to as Brooks) commenced this action seeking to recover compensation for property taken by the city for street purposes. The city joined Lester L. Berglund, Patricia J. Berglund, William T. Kenney, and Dorothy K. Kenney (hereafter collectively referred to as Berglund) as third-party defendants, apparently seeking to recover from Berglund the amount it had paid to them in the event it was required to pay Brooks. By agreement of counsel, the third-party action against Berglund by the city was separated pursuant to Rule 42.02, Rules of Civil Procedure, for trial after disposition of the case now before us. Thus, the only claim involved in this appeal is that of Brooks against the city.

There is little serious dispute between the parties as to the facts. In approximately 1965, Berglund purchased for the sum of $12,000 property located in the city and legally described as follows:

"Lots 1 and 2 except the North 125 feet of the East 100 feet of Lot 1, Sabin Lyndale Garden Lots, according to the map or plat thereof on file or of record in the Office of the Register of Deeds in and for Hennepin County, Minnesota."

During the period from 1965 to June 1967, Berglund made plans for development of this property. As a condition to approving a conditional-use permit and subdivision sought by Berglund, the city required that an easement over the west 30 feet of the two lots be dedicated to the city for a portion of Aldrich Avenue South, which the city then contemplated building. The city attempted to have Berglund sign a deed granting it an easement, but this was never accomplished. In late 1967, without such easement, the city began laying sewer and water lines in the vicinity of what was to become Aldrich Avenue South, including the land involved here.

In April 1968, Berglund agreed to sell the two lots to Brooks for the sum of $24,000, plus $2,000 for sale of Berglund's development plans if Brooks wished to buy them. During April 1968, this purchase agreement was canceled due to Berglund's failure to perform all of its contingencies.

During the summer of 1968, the city proceeded with the construction of Aldrich Avenue South, including the portion over the lots in question, completing the project on September 3, 1968. At that time, no subdivision plat had been filed dedicating the strip in question for use as part of the street, and the city had taken no action to acquire title to the property by condemnation.

In May 1968, Berglund learned that owners of neighboring properties on Aldrich Avenue South had received compensation for the street easement taken. He then began negotiations with the city to be compensated for the strip across the two lots involved in this action.

On December 10, 1968, Berglund entered into a purchase agreement with Brooks under which he later conveyed the lots in question on June 26, 1969, by warranty deed. The deed was recorded with the register of deeds of Hennepin County on June 30, 1969. The legal description in this deed was as follows:

"Lots 1 and 2 except the North 125 feet of the East 100 feet of Lot 1, Sabin Lyndale Garden Lots, according to the map or plat thereof on file or of record in the office of the Register of Deeds in and for Hennepin County, Minnesota.

"Subject to existing streets.

"Subject to restrictions, reservations and easements of record, if any."

The consideration for this conveyance was $20,000, with no provision similar to that for the sale of development plans which had been included in the original purchase agreement. Apparently Berglund and Brooks never discussed the status of the 30-foot strip nor the rights of the parties to any possible condemnation award.

The development which had been planned for the property was never completed and the project was abandoned in January 1970. As a result, no subdivision plat dedicating the west 30 feet of the lots to the city for Aldrich Avenue South was filed.

Having discovered that others had been paid for easements over their land to build Aldrich Avenue South, Berglund on or about June 29, 1970, commenced a mandamus action against the city, seeking to compel inverse condemnation of the strip across these two lots on which Aldrich Avenue South was constructed and asking for compensation in the sum of $8,500. In his pleadings, Berglund claimed that he was the owner of the west 30 feet of Lots 1 and 2, notwithstanding the June 26, 1969, conveyance of the lots to Brooks.

The city thereafter decided to proceed with the condemnation voluntarily. It filed an amended petition for condemnation of the strip across these two lots on August 13, 1970. The property it sought to condemn was:

"A *permanent easement* for street purposes over and across the Westerly 30 feet of Lots 1 and 2, except the North 125 feet of the East 100 feet of Lot 1, Sabin Lyndale Garden Lots, Hennepin County, Minnesota." (Italics supplied.)

After commencement of this condemnation proceeding, Berglund abandoned his mandamus action. The city stated in its petition to condemn that to the best of its knowledge the owners of the property were "Lester L. Berglund and Patricia J. Berglund, husband and wife." Although Brooks' ownership had been a matter of record since June 30, 1969, the city named the Berglunds as the "owners" of this property in the condemnation documents and served no notice of the condemnation proceedings on Brooks.

At the condemnation hearing, Lester Berglund testified that he was the owner of the property. The condemnation proceeded and on December 22, 1970, the city issued a check payable to Berglund, his wife, and his attorneys in the amount of $8,700. At approximately the same time, the city sought to obtain Brooks' signature on a warranty deed conveying the strip to the city. Brooks then, for the first time, learned of the condemnation proceeding and refused to execute the deed. Instead, he suggested that payment of the city's check to Berglund be stopped, but by

that time Berglund had cashed the check and divided the proceeds. Before trial of the present action, both parties moved for summary judgment. The court entered findings of fact, conclusions of law, and order for summary judgment in favor of Brooks, requiring the city to pay Brooks $8,500 with interest, substantially the amount it had earlier paid Berglund. This appeal followed.

Essentially, the only question we need decide is: Who is entitled to the condemnation award—Berglund, who owned the property at the time the city proceeded to construct the street, or Brooks, who owned it by virtue of the conveyance from Berglund at the time the condemnation proceeding was completed? Putting it more precisely, we might state the question thus: Where a city constructs a street across a parcel of land which is thereafter sold by its original owner to another person prior to formal condemnation proceedings, is the original owner or his vendee entitled to the condemnation award?

The trial court held that Brooks was the owner of the property at the time of the taking and was thus entitled to the condemnation award.[1] The trial court also held that the city was directly liable to Brooks for paying the award to Berglund because it had a statutory duty to give Brooks as record owner of the fee notice of the condemnation proceedings under Minn. St. 1969, §§ 117.05 and 117.20, subd. 8(a).[2] On the other hand, it is the position of the city on this appeal that, notwithstanding any wrongful failure to serve Brooks with notice, it is not liable to him because Berglund as a matter of law was entitled to the award and thus

---

[1] In explaining his conclusion, the court said: "As the owner of the property in question at the time of the condemnation proceeding and award, Brooks is entitled to the condemnation proceeds, notwithstanding the fact that the physical appropriation occurred prior to the June 26, 1969 conveyance to Brooks, since the sellers did not reserve any right to such proceeds."

[2] The statutes which were in effect at all times relevant for purposes of this appeal were repealed in 1971 and provisions covering the same subject matter were enacted. L. 1971, c. 595.

Brooks has not been injured by failure to receive notice. Both parties apparently proceed on the theory that the decisive question is the time when the "taking" occurred. Both parties appear to agree that the owner at the time of the taking is entitled to the condemnation award. The city contends that a taking occurs under Minnesota law either when title to the property is vested in the condemnor or when the property is injured. The city argues that it is the earlier of these two events, if both occur, that determines the time of taking. It is apparent that at the time the property was injured, that is, at the time the city proceeded to build Aldrich Avenue South without any easement or other right, Berglund was the record owner. Brooks, on the other hand, contends that under Minnesota law a taking never occurs until compensation is paid or secured. At the time the compensation was paid in this case, Brooks was the record owner of the property.

Neither party distinguishes between a lawful and an unlawful taking. The city relies on Minn. St. 1969, § 117.02, subd. 2, for the proposition that any interference with one's possession and enjoyment of his property is a "taking." It also relies on Burger v. City of St. Paul, 241 Minn. 285, 64 N. W. 2d 73 (1954), for the proposition that a substantial interference with private property is a "taking" within the meaning of Minn. Const. art. 1, § 13. Brooks, on the other hand, speaks only of lawful takings. His argument is based on Minn. Const. art. 1, § 13, which reads in part:

"Private property shall not be taken, destroyed or damaged for public use without just compensation therefor, first paid or secured."

Brooks argues that the use of the term "first" means there can be no taking until compensation is paid or secured. He relies on a line of Minnesota cases commencing with Blue Earth County v. St. Paul & Sioux City R. Co. 28 Minn. 503, 11 N. W. 73 (1881), in which the court was attempting to determine whether prop-

erty taken by a railroad exercising its eminent domain powers should be valued as of the date the railroad entered into possession of the property or as of the later date when a condemnation award was made.

While these cases hold that the valuation is to be made at the time of the award rather than of the original unlawful entry, it must be kept in mind that they were decided before Minn. Const. art. 1, § 13, was amended in 1896 to include the right to compensation where private property was "destroyed or damaged" as well as taken for public use.[3] The case of Fish v. Chicago, St. Paul & Kansas City Ry. Co. 84 Minn. 179, 87 N. W. 606 (1901), was commenced in 1888, prior to the amendment of our constitution. The decision was rendered in 1901 after passage of the amendment. While the decision is undoubtedly based on the law at the time the case was commenced, we pointed out that prior to the amendment an owner of land had a separate and independent cause of action to recover damages that accrued between the time of the original trespass and the condemnation action. After the amendment, an inverse condemnation would require the condemnor to provide compensation for damages to realty as well as for a formal taking.[4]

The authorities relied upon by the city seek to establish that where no formal condemnation is undertaken, the date of the taking is the date of the governmental interference with the owner's property interest. Brooks, on the other hand, relies on authorities tending to show that where a formal condemnation action is commenced before the government enters into possession, the date of the taking is the date of the condemnation award. Neither of

---

[3] See historical note, 1 M. S. A. p. 497, which reads: "The section was broadened by the amendment of Nov. 3, 1896, to include property 'destroyed or damaged' for public use. Prior to such amendment it was limited to property 'taken'."

For the effect of the amendment, see Dickerman v. City of Duluth, 88 Minn. 288, 92 N. W. 1119 (1903).

[4] See cases from other jurisdictions collected in Annotation, 2 A. L. R. 3d 1038.

these lines of authority is controlling in a case such as this, where a taking occurs for which the constitution requires that compensation be made and an inverse condemnation thereafter requires the condemnor to condemn whatever interest it has already taken. In other words, where the condemnor first enters into possession and destroys or damages the owner's interest in the property and is later forced to formally condemn it, the cases relied upon by either party are not controlling. In Alevizos v. Metropolitan Airports Comm. 298 Minn. 471, 477, 216 N. W. 2d 651, 657 (1974), we adopted the following definition of inverse condemnation:

"* * * [T]he popular description of a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency."

Thus, it is important to bear in mind the difference between the rights of successive owners in a case such as this where the taking in a constitutional sense precedes the formal condemnation proceeding under which payment is eventually made.

Because of its failure to note this crucial distinction, Brooks' reliance on Victor Co. Inc. v. State, by Head, 290 Minn. 40, 44, 186 N. W. 2d 168, 172 (1971), is misplaced. There, we said:

"* * * [P]etitioner divested itself of the right to claim consequential damages to the manufacturing plant by transferring title before the filing of the commissioners' award and before title to the land taken vested in the condemnor. Where such transfer of title occurs, the purchaser acquires the right to any damages to be awarded for the taking of the property sold unless the vendor reserves the right to such damages in the deed of conveyance."

Taken out of context, this language appears to support Brooks' position, but Victor is distinguishable from the case at bar. In that case, the property owner owned a manufacturing plant and

a parking lot. The state brought formal condemnation proceedings to take the parking lot. During the pendency of the condemnation proceedings, the owner sold the plant. When the condemnation award included no consequential damages for the diminution in value of the plant caused by the loss of the parking lot, the original owner commenced an inverse condemnation proceeding to recover those consequential damages. We held that in view of the fact that the original owner had sold the manufacturing plant, he could not recover consequential damages. That case is not controlling here because in Victor the state had actually commenced a formal condemnation proceeding and the right to consequential damages could be litigated only in an appeal from any award made in that proceeding. Here, the city physically appropriated part of the property before Berglund conveyed the parcel to Brooks and prior to any formal condemnation proceeding at the time of the appropriation.

There are no Minnesota cases squarely in point with the fact situation in the instant action. There are, however, numerous decisions in foreign jurisdictions which have considered problems similar to the one before us. The law seems to be well settled and consistent from jurisdiction to jurisdiction despite the fact that neither of the parties in the case before us has attempted to evaluate these foreign decisions.

The parties both argue strenuously as to the meaning of 2 Nichols, Eminent Domain (Rev. 3 ed.) § 5.1(4), where we find the following:

"It is well settled that when there is a taking of property by eminent domain *in compliance with law,* it is the owner of the property *at the time of the taking* who is entitled to compensation. Consequently, if the parcel of land from which the taking is made changes hands after the taking has occurred but before the compensation has been paid, the right to receive the compensation does not run with the land, but remains a personal claim of the person who was the owner at the time of the taking, or of his representatives." (Italics supplied in part.)

Thus, both parties argue that the crucial question is: When is the time of taking? Both parties ignore § 5.21, where we find the following statement:

"If a parcel of land is sold after a portion of it has been taken (or after it has been injuriously affected by the construction of some authorized public work), the right to compensation, constitutional or statutory, does not run with the land but remains a personal claim in the hands of the vendor, unless it has been assigned by special assignment or by a provision in the deed. * * * Conversely, if the land is sold after condemnation proceedings have been instituted, but before the *punctum temporis* of the taking, the purchaser, and not the vendor, is entitled to the compensation unless the right to receive the compensation is expressly reserved by the vendor, or the vendee has waived his rights in favor of the vendor."

A similar statement of the general rule is found in 29A C. J. S., Eminent Domain, § 202, as follows:

"Damages for the taking of land or for the injury to land not taken belong to the one who owns the land at the time of the taking or injury, and they do not pass to a subsequent grantee of the land, except by a provision to that effect in the deed or by separate assignment. * * * Some authorities have held that where the entry or taking was wrongful a subsequent purchaser may recover compensation therefor, but other authorities hold that the right of action is in the grantor alone, notwithstanding the entry was without his consent and without condemnation.
* * * * *
"* * * In general, where property is conveyed after the commencement of condemnation proceedings but before the time when the taking is complete, the purchaser is entitled to the compensation, unless such compensation is expressly reserved to the grantor."

To put it simply, the rule Brooks urges us to adopt applies only when a sale of the property is made during the pendency of the

condemnation proceeding and where there has been no taking of possession or destruction of the property in the constitutional sense by the condemnor prior to the sale. Where the governmental body does take possession of the property or damages it so as to deprive the owner of possession prior to the sale, the original owner is entitled to the award.[5]

The rationale behind this rule seems to be simple and logical. When the government interferes with a person's right to possession and enjoyment of his property to such an extent so as to create a "taking" in the constitutional sense, a right to compensation vests in the person owning the property at the time of such interference. This right has the status of property, is personal to the owner, and does not run with the land if he should subsequently transfer it without an assignment of such right. The theory is that where the government interferes with a person's property to such a substantial extent, the owner has lost a part of his interest in the real property. Substituted for the property loss is the right to compensation. When the original owner conveys what remains of the realty, he does not transfer the right to compensation for the portion he has lost without a separate assignment of such right. If the rule were otherwise, the original owner of damaged property would suffer a loss and the purchaser of that property would receive a windfall. Presumably,

---

[5] See, e.g., United States v. Dow, 357 U. S. 17, 78 S. Ct. 1039, 2 L. ed. 2d 1109 (1958); Toles v. United States, 371 F. 2d 784 (10 Cir. 1967); Duke Power Co. v. Rutland, 60 F. 2d 194 (4 Cir. 1932); Majestic Heights Co. v. Board of County Commrs. 173 Colo. 178, 476 P. 2d 745 (1970); Enke v. City of Greeley, 31 Colo. App. 337, 504 P. 2d 1112 (1972); Dougherty County v. Pylant, 104 Ga. App. 468, 122 S. E. 2d 117 (1961); Crawford v. City of Des Moines, 255 Iowa 861, 124 N. W. 2d 868 (1963); Steele v. City of Topeka, 138 Kan. 425, 26 P. 2d 447 (1933); Markiewicus v. Town of Methuen, 300 Mass. 560, 16 N. E. 2d 32 (1938); City of Albuquerque v. Chapman, 77 N. Mex. 86, 419 P. 2d 460 (1966); Steinle v. City of Cincinnati, 142 Ohio St. 550, 53 N. E. 2d 800 (1944); Rogers v. Oklahoma City, 190 Okla. 78, 120 P. 2d 997 (1942); Matthews v. City of Fort Worth, 84 S. W. 2d 803 (Tex. Civ. App. 1935); Gillam v. City of Centralia, 14 Wash. 2d 523, 128 P. 2d 661 (1942).

the purchaser will pay the seller only for the real property interest that the seller possesses at the time of the sale and can transfer. In this case that was the real estate less the street unlawfully taken by the city.

Although most of the cases that deal with the issue merely apply this rule and do not analyze it in depth, a few of them offer good statements of the rule and its rationale.

In Crawford v. City of Des Moines, 255 Iowa 861, 866, 124 N. W. 2d 868, 871 (1963), the Iowa Supreme Court said:

"* * * It is true that generally it is the owners of property to be taken by condemnation who must be compensated and who are entitled to litigate questions arising from condemnation proceedings or alleged unlawful takings. But we are here dealing with a right rather than the actual property. An owner of property may be entitled to damages for a taking for a public use, even though he has parted with his title and ownership before the award is paid. Thus, one who sells while condemnation proceedings are pending is entitled to the damages finally awarded as against his vendee, if his possession was taken from him while he still owned the property. If, however, his possession has not been disturbed during his period of ownership, but possession is taken by the condemnor after he has parted with title, his vendee or transferee may claim the awarded damages."

In Enke v. City of Greeley, 31 Colo. App. 337, 339, 504 P. 2d 1112, 1113 (1972), a Colorado intermediate appellate court explained the matter as follows:

"Even though the record discloses that no compensation was ever paid to Spitzer, and assuming that he had a right to just compensation for the taking of his land, that right does not devolve upon the plaintiffs by their purchase of the land. The Supreme Court of Colorado in the *Rogers* case addressed this issue as follows:

'Whatever may be the right to compensation for the value of the land taken and damages to the residue occasioned by the tak-

ing, it was a personal one which belonged to the owner. In the instant case, it did not pass by deed to plaintiff, and there is no evidence that he ever acquired such right by assignment from the owner. He took the land in the condition it was in when he acquired title, and his right in this action is limited to the damages, if any, which have since accrued. The land was burdened with this right of way when plaintiff purchased it; therefore he was confined in his recovery to the damages, if any, subsequently arising.' "

In a similar vein the Oklahoma Supreme Court, in Rogers v. Oklahoma City, 190 Okla. 78, 81, 120 P. 2d 997, 1001 (1942), noted:

"There are exceptions to the rule, but it may be said that it is almost universally applied. * * * In the latter case, the court, discussing the question, stated:

" 'There is another corollary which follows from the same principles. Where land is thus seized unlawfully, the whole injury is done at the first seizure. The state holds the land; the owner is entitled to its full value. It is seized, if seized at all, for the whole period it is to serve as a public user. The whole injury is to the person who is owner at the first seizure. If a person buys afterward he buys subject to the public user, and all his rights are subject thereto. There can be no subsequent trespass as against him, and the defendant can defend himself under the general issue without notice. Lands in such cases are seized by the public for great public trusts . . . . It follows that if the defendants seized this land without payment or consent, they are liable to the person who owned the land at the time of the seizure as for a condemnation, and not to any subsequent owner. The plaintiff's grantor, therefore, if anybody, is the one entitled to damages . . . . So that, whether the defendants took possession originally rightfully or wrongfully, it is manifest that the present plaintiff has no legal cause of action.' "

Where there is an entry into possession by the condemning

authority prior to the commencement of formal condemnation proceedings, the constitutional taking which occurs at the entry must be considered the taking for all purposes. As the United States Supreme Court noted in United States v. Dow, 357 U. S. 17, 24, 78 S. Ct. 1039, 1045, 2 L. ed. 2d 1109, 1115 (1958), "it would certainly be bizarre to hold that there were two different 'takings' of the same property, with some incidents of the taking determined as of one date and some as of the other."

Thus, while it has not been discussed by either party, it becomes important to determine what interest the condemnor "takes" or acquires when it physically appropriates property without first formally condemning it. The general rule as to the rights acquired through physical condemnation combined with the construction of valuable improvements for the public benefit is stated in 2 Nichols, Eminent Domain (Rev. 3 ed.) § 6.21, as follows:

"Where an entity, vested with the power of eminent domain, enters into actual possession of land necessary for its purposes, with or without the consent of the owner, and the latter remains inactive while valuable improvements are being constructed thereon, the use of which require a continued use of the land, the appropriation is treated as equivalent to title by appropriation. * * * Such taking is frequently referred to as a 'common law' taking or a 'de facto' taking."

Similarly, in Eyherabide v. United States, 345 F. 2d 565, 567, 170 Ct. Cl. 598, 601 (1965), the court said:

"Federal law recognizes that, although there may be no official intention to acquire any property interest, certain governmental actions entail such an actual invasion of private property rights that a constitutional taking must be implied. * * * The interference with use or possession may be so substantial and of such a character that it cannot be done without compensation under the Federal Government's regulatory and executive powers. *Where these factors exist and constitutional taking is implied,*

*it is assumed that the United States has acquired a definite inter-est in the property, permanent or temporary, such as fee title, an easement, a servitude, or a leasehold."* (Italics supplied.)

It is well settled that a de facto taking creates in the condem-nor a protectable legal interest in the property which is equiva-lent to title by condemnation; the condemnor can be forced to compensate to the original owner of the property, but the owner cannot eject the condemnor nor can he require discontinuance of the public use.[6]

Since the de facto taking creates in the condemnor an interest equivalent to title by condemnation, it follows that the extent of the interest acquired is that necessary to accomplish the pub-lic purpose for which the property is taken. Accordingly, where the condemnor constructs a street through the exercise of the eminent domain power and where the legislature has not express-ly authorized it to take a fee, it acquires a mere easement. See, Fairchild v. City of St. Paul, 46 Minn. 540, 49 N. W. 325 (1891).

Applying these principles to the facts of this case, it seems clear that a substantial interference with Berglund's property, so as to constitute a taking in the constitutional sense, occurred when the city built a street across his property. His use and en-joyment of that part of his property over which the street was built were, for all practical purposes, lost and destroyed. It is doubtful that Brooks intended to buy, or that Berglund intended to sell, a portion of Aldrich Avenue South. The original purchase price contemplated by the parties was significantly higher than the price in the contract actually performed. While there is noth-ing in the record to indicate that this reduction was attributable

---

[6] See, e. g., Hurley v. Kincaid, 285 U. S. 95, 52 S. Ct. 267, 76 L. ed. 637 (1932); State of California v. Rank, 293 F. 2d 340 (9 Cir. 1961); United States v. Lacy, 116 F. Supp. 15 (N. D. Ala. 1953); Cothran v. San Jose Water Works, 58 Cal. 2d 608, 25 Cal. Rptr. 569, 375 P. 2d 449 (1962); Shell Petroleum Corp. v. Town of Fairfax, 180 Okla. 326, 69 P. 2d 649 (1937); St. Louis & S. F. Ry. Co. v. Mann, 79 Okla. 160, 192 P. 231 (1920); Tomasek v. State, 196 Ore. 120, 248 P. 2d 703 (1952).

to the taking of the street by the city, it is reasonable to assume that it may have been a factor.

At the time that it built Aldrich Avenue South across the property, the city acquired an interest in the property equivalent to an easement over the strip upon which the street lay. Though formal legal title in the city may not have been confirmed until the condemnation proceedings were brought, Brooks, in effect, took the property subject to the city's street easement. We therefore conclude that, as a matter of law on the admitted facts, the city was entitled to summary judgment holding that its payment to Berglund was proper.

In short, one who has a cause of action for inverse condemnation has a right based on tort rather than an interest in the land.[7] There are no reported Minnesota cases which reject this rule.[8] To adopt the rule urged by Brooks may well offend the constitutional provisions involved because the net result would be that the person whose interest has been destroyed is left without compensation even though there has been a taking in the constitutional sense.

In view of our decision on this issue, we need not consider or determine other issues raised by this appeal.

The judgment is reversed and the case remanded with instructions to enter judgment for appellant.

Reversed.

---

[7] For a discussion of the close relationship between inverse condemnation and the torts of trespass and nuisance, see Alevizos v. Metropolitan Airports Comm. 298 Minn. 471, 216 N. W. 2d 651 (1974).

[8] North Carolina seems to be the only state to apply a different rule. There, the seller is entitled to damages for trespass and the buyer is entitled to recover the award or damages for the taking. See, Duke Power Co. v. Toms, 118 F. 2d 443 (4 Cir. 1941) (applying North Carolina law).