352 So.2d 885 (1977)
D.W. KNAPPEN and Betty T. Knappen, Petitioners,
v.
DIVISION OF ADMINISTRATION, STATE of Florida DEPARTMENT OF TRANSPORTATION, Respondent.
No. 76-1182.
District Court of Appeal of Florida, Second District.
November 16, 1977.
Rehearing Denied December 28, 1977.
H. Rex Owen of Owen & McCrory, St. Petersburg, for petitioners.
*886 Alan E. DeSerio and H. Reynolds Sampson, Tallahassee, for respondent.
OTT, Judge.
Plaintiff/respondent  the State Department of Transportation [hereinafter DOT]  commenced an eminent domain proceeding for highway purposes by filing a complaint in February 1976 seeking the appropriation, inter alia, of two parcels owned by petitioners/defendants (husband and wife). Petitioners responded with a motion to dismiss the complaint and an answer questioning the necessity for the taking. After a hearing, the court below entered its order of taking. With reference to the "necessity" issue the court held as follows:
Upon this issue the Court has heard conflicting testimony of qualified experts of each of the parties. Taken in the best light to the defendants [the property owners] the testimony as a whole demonstrates that a roadway of similar function and characteristics could be constructed within the right of way now existing adjacent to these parcels. The testimony does not place in issue the necessity of the underlying project but only the design by which the same is to be accomplished. [Emphasis supplied]
The court found that the taking of the subject land was necessary. Petitioners' motion to dismiss was denied. From the resulting order of taking petitioners filed their petition for writ of certiorari. We grant their petition and issue the writ for reasons hereinafter stated.
The property taken consisted of two parcels owned by petitioners  parcels 105 and 167. Parcel 105 was a narrow rectangular strip on the east side of Gulf Boulevard in Treasure Island, Florida. Parcel 167 was a narrow rectangular strip on the west side of the street, slightly to the north of Parcel 105. These two rectangular additions were for the purpose of enlarging the existing approximately 66-foot right of way to an 80-foot right of way.
On the east side of Gulf Boulevard, [the parcel 105 side] petitioners owned two motels: the Treasure Park and the Sun Tide. On the west side of Gulf Boulevard, [the parcel 167 side] the petitioners owned three motels: the Tahitian, Imperial and Newport Villa.
At the point of petitioners' land the DOT condemnation called for an 80-foot right of way. Under its design, the actual pavement width or "impass" would be 61 feet.[1] The remaining 19 feet would be equally divided and contemplated a sidewalk, a grass strip (the border area) and a 6-inch curb on each side. The DOT conceded this particular segment was in a narrow land area between two bodies of water and that the private property of the petitioners was already squeezed to the limit. The taking of each additional foot admittedly caused severe hardship.
The result of this taking on petitioners' parking area would be as follows:

 EXISTING SPACES TO BE SPACES PERCENTAGE
 MOTEL PARKING SPACES TAKEN BY DOT REMAINING REMAINING 
Treasure Park 13 4 9 69%
Sun Tide 9 4 5 56%
Tahitian 8 3 5 63%
Imperial 7 2 5 71%
Newport Villa 11 5 6 55%
 __
 18[2]
At the hearing, the DOT's witness  Cochran  testified on cross-examination to the effect that the existing 66-foot right of way would suffice under certain circumstances, *887 i.e. if the public is adequately served in the sense of traffic movement and safety, then the 66-foot right of way would be adequate. Cochran did state, however, that he thought an 80-foot right of way was necessary, but failed to give any factual basis as to the "necessity" for an 80-foot right of way here as opposed to other segments where the existing 66-foot right of way was all that was "necessary."
Cochran testified that the DOT in designing the facility relied upon two manuals (the "Red Book" and the "Blue Book") published by the American Association of Transportation. These manuals comprise the established design criteria for all transportation projects. In questioning Cochran, counsel for the petitioners read two excerpts from the "Red Book" into the record:
For their proper functions, many forms of land use require areas of substantial size and confirmation together with supporting facilities. There should be minimum disruption of such areas by major traffic ways.
Highway design determines the minimum right-of-way taking. But the taking should be realistic and considerate regarding each property holder or user. Study should be given each property taken in relation to alignment and cross section alternatives. The effect of taking on the remaining land use, including accessibility, and on residents or on business locations should be analyzed in advance. [Emphasis supplied][3]
This amounts to a common sense recognition of reality  that you expand or contract road designs within the alternatives provided according to the particular uses and requirements of adjacent private property owners.
Also on cross-examination, Cochran testified that it was acceptable under the "Red Book" to put a sidewalk adjacent to a curb. Cochran stated that although ideally a "border area" (the grass strip between the sidewalk and the curb or the distance from the bank of the curb to the right of way line) should be present, the "Red Book" permitted its omission. There was nothing in the published criteria requiring the inclusion of the "border area" for the proposed facility.
Cochran's personal rationale was that the less border area there was the more chance there was for a vehicle entering the road to turn into the "inside" lane [the lane closest to the median]. He maintained that the inclusion of a border area would insure fewer turns encroaching into the "inside" or passing lane. Yet Cochran admitted that the DOT design called for the sidewalk being adjacent to the curb in front of park property [beach area set aside for public use] located about 100 feet south of parcel 167. The design for that segment was accomplished within the existing 66-foot right of way. Cochran explained this on the ground that it was a common practice to "design around ... 4-F involvement." This was simply another way of saying that the taking of right of way in park areas was usually avoided because of the red tape involved. He stated that the approval needed to utilize park lands was very difficult and time consuming to work out. In short, in the segment of the project south of petitioners' land, the DOT  for its own convenience  chose to work within the 66-foot right of way, eliminate the "border area" and use a design essentially equivalent to that advocated by petitioners.
It was also conceded that the 66-foot right of way had been employed in the Madeira Beach section of the same project. Insofar as traffic flow, safety and general character of adjacent property uses and requirements, etc. are concerned nothing was offered to justify the change in design and resulting right of way requirements.
With reference to the funding of the Gulf Boulevard project Cochran testified that the right of way was to be purchased using federal funds. He stated that Pinellas County had agreed to reimburse the DOT *888 over a five-year period out of secondary road gas tax funds. Further enlightening on the funding question was the testimony of the DOT district engineer, Monts de Oca. He stated that no state funds had been used for road right of way acquisition (primary or secondary roads) for several years. Also relevant to the funding question was the deposition of Webb, the Secretary of the DOT. He confirmed that state funds were limited for the acquisition of right of way. He intimated that to attract federal funds a right of way wider than 66 feet (i.e. 80 feet) would have to be applied for. Specific reference was made in the questioning of Webb to a letter from Monts de Oca dated December 16, 1969 which provided in relevant part:
Because of limited State funds, I do not know whether or not we can program the section of State Road 699 [the section at issue] under the same programing. [The 66-foot right of way programing which was used in the Madeira Beach section of the project.]
... I shall be re-evaluating my five-year construction program using projected construction funds supplied by our Fiscal Department in Tallahassee. If the projected funds indicate that this project can be scheduled for construction as a State project, then we will plan and program the project in this manner. If, however, our state funds are limited to the point where we cannot build the project without federal aid, then we must comply with the Bureau of Public Roads requirements concerning right of way widths and design standards.
Since the plans are virtually complete for this section [the section at issue] using the federal requirements, if it is at all possible to furnish the necessary right-of-way to accomplish this project as a federal project, we should do so.
In his deposition Webb added the following:
Q. Now as Secretary and after having read this letter, do you understand this letter to be saying that in Madeira Beach we have State funds to build this with a 66-foot right-of-way, but in Treasure Island we don't have enough funds, so we are going to have to fund it with Federal money?
A. No, I don't read it that way.
Q. Could you tell me how you read it?
A. I read it to say that he would try to program it, but he had very serious doubt about whether he could program it to be constructed with State funds, recognizing the critical nature of that supply of funds.
Q. Okay, sir. Then am I correct in assuming beyond what you have just explained that since he did not have those State funds he would look to Federal funds and then he would have to have a wider right-of-way?
A. Yes, that's what he is saying.
All of this would appear to be susceptible of three meanings: either we will go to an 80-foot right of way if we decide to secure federal funds; or in view of the availability of federal funds we can afford the 80-foot right of way; or, in order to qualify for federal funds we should shift to an 80-foot right of way. The latter meaning  even if believed by the writer  seems to be unjustified in view of the alternative design being acceptable under federal as well as state standards. In any case, none of the three possible meanings offer any support for "necessity."
Petitioners called Tipton, a traffic engineer certified as an expert in traffic design. Tipton testified that based upon the Red Book, DOT data and figures of anticipated traffic run in 1995 (21,200 vehicles per day) that a "configuration of a facility capable of handling the capacity of traffic that the DOT said would be there" could be handled by the existing 66-foot right of way. According to Tipton one "possible design" contemplated a 57-foot impass[4] (as opposed to the DOT's 61 feet). The remaining 4.5 feet on either side of the street would involve a sidewalk and a 6-inch curb. No allocation *889 was made for the grass strip which was the border area.
Tipton pointed out that the 19 feet beyond the curb line which the DOT included in its right of way (80 less 61) had absolutely no effect on capacity to move traffic. Tipton contemplated four 11-foot lanes with a 10-foot turning lane; the DOT contemplated four 12-foot lanes with a 10-foot turning lane. The court posed the question:
Q. What does the difference in one-foot in lane width have to do with capacity to move traffic through that lane? You are talking about volume of capacity. You can only move one car through at a time.
Tipton answered that unlike water passing through a pipe where a 3-inch pipe would get more water through than a 2-inch pipe, that automobile lanes were different in the sense that only one car could be in one lane at a time. He granted that there could be more freedom of movement in a 12-foot lane than in an 11-foot lane but that the effect on capacity would be minimal at best.
Tipton stated that based upon the DOT figures an 80-foot right of way would accommodate 23,500 cars per day; a 66-foot right of way would accommodate 21,500 cars per day. [As pointed out supra, the DOT projects an anticipated traffic run of 21,200 cars per day in 1995.]
With reference to the plight of the petitioners, Tipton testified that parking was "extremely tight" in the vicinity of petitioners' motel and that "there is not much of it [parking] in this area." Under Tipton's "possible design" of a 66-foot right of way petitioners would lose fewer spaces than under the DOT proposal. Under the Tipton proposal, the following loss of parking places would be felt by each motel:

 EXISTING SPACES TO BE SPACES PERCENTAGE
 MOTEL PARKING SPACES TAKEN BY DOT REMAINING REMAINING 
Treasure Park 13 2 11 85%
Sun Tide 9 2 7 78%
Tahitian 8 2 6 75%
Imperial 7 1 6 86%
Newport Villa 11 2 9 82%

Thus, under the Tipton proposal only 9 of the 48 existing parking places would be lost. In contrast, under the DOT proposal up to 18 of the 48 parking places would be lost. That this would be a "precious saving" to the petitioners was granted by Cochran in his testimony to the effect that the 66-foot right of way would be adequate under certain circumstances.
Tipton pointed out that under either the 66-foot or the 80-foot right of way, motel customers would still  as they do at present  have to back out onto Gulf Boulevard because of the extremely narrow width of the lots. There is not now nor would there be under either alternative enough space to turn around.
At issue is whether the trial court departed from the essential requirements of law and whether petitioners would suffer irreparable damage because of the proposed taking. We answer both questions in the affirmative.[5]
In its taking, the lower court cited with approval the case of Hillsborough County v. Sapp, 280 So.2d 443, 445 (Fla. 1973):
Once a condemning authority decides that a taking is necessary, selects one of the alternatives open to it, and applies to *890 a court for approval of the taking, the role of the court is limited to assuring that the condemnor acted in good faith, did not exceed its authority, and did not abuse its discretion.
The court in Sapp went on to say:
When the trial court approves the determination of reasonable necessity and finds no abuse of discretion, a reviewing court is then limited to deciding whether or not there was competent substantial evidence to support the decision of the trial court. 280 So.2d at 445.
We hold that there was not competent substantial evidence to support the decision of the trial court. Specifically, we find that a careful reading of the evidence indicates that the condemnor took more than was necessary.
It has long been the law in Florida that a condemnor may take private property for public use only when it is necessary for such use. Wilton v. St. Johns County, 98 Fla. 26, 123 So. 527 (1929). In Miller v. Florida Inland Navigation District, 130 So.2d 615, 623 (Fla. 1st DCA 1961) the court held:
There is no logical difference between the well-recognized illegality in taking a greater quantity of property than is necessary to serve a particular public use and that of taking a greater interest or estate therein than is required for the contemplated use.
In Canal Authority v. Litzel, 243 So.2d 135, 137 (Fla. 1970) the court held that "[t]o satisfy the initial burden of showing some necessity the condemning authority is not required to prove absolute necessity." See Dade County v. Paxson, 270 So.2d 455 (Fla. 3d DCA 1972). In the recent landmark case of City of Jacksonville v. Griffin, 346 So.2d 988 (Fla. 1977) the "essential issue [was] whether the City [condemnor] made a showing of reasonable necessity for the condemnation of respondent's land." 346 So.2d at 989. The supreme court reversed the district court's finding that there was no showing of reasonable necessity. The supreme court, relying extensively upon Canal Authority v. Litzel, supra, held that the city had proven a reasonable necessity for the taking. The Griffin court receded from its decision in Ball v. City of Tallahassee, 281 So.2d 333 (Fla. 1973) in the sense that Ball placed an "unreasonable gloss upon the rule of law enunciated in the Canal Authority cases." The Griffin court stated:
To the extent that Ball requires that a condemnor must present evidence pinpointing the need for the particular property sought to be condemned, we recede from that case and reaffirm the rule of law expressed in the Canal Authority cases. 346 So.2d at 991.
The Griffin court pointed out that:
Were the City not permitted to exercise its discretion in good faith as to the sequence of the parcels to be condemned, then each land owner would be able to raise the question, "Why not my neighbor?" and thereby effectively frustrate commencement or continuation of the project. 346 So.2d at 991.
Petitioners' position is not an attempt to raise the question "Why not my neighbor?". Neither are we in the same type of situation as that found in the case of Chipola Nurseries, Inc. v. Division of Administration, Department of Transportation, 294 So.2d 357 (Fla. 1st DCA 1974) in which the court held:
It is not bad faith on the part of the condemning authority to fail to "give as much study to the alternative route suggested" by neighboring land owners as was given to the selection of the route ultimately selected. 294 So.2d at 359.
See Inland Waterway Development Co. v. City of Jacksonville, 38 So.2d 676 (Fla. 1948); Catholic Burse Endowment Fund v. State Road Department, 180 So.2d 513 (Fla. 2d DCA 1965).
Distinct from both the Griffin and Chipola situations, the condemning authority in the instant case overstepped the bounds of necessity for no good reason. The only basis that can be inferred from the evidence is that the DOT  fearful of the shortage of state funds for the Treasure Island portion of the Gulf Boulevard project  decided the *891 enlarged right of way would materially assist in attracting federal funds.
The trial court concluded that the "design" of the project is not subject to review; determination of necessity being confined to whether or not the project was shown to be "necessary." However, "design" can become material because it determines quantity, especially if the design is dictated by valid considerations. Clearly, the condemnor cannot take more than is necessary for the project. Equally clearly, the determination of design and resulting quantity should not be questioned solely on the basis of the opinion of one expert against that of another. This is comparable to a "choice of routes" in which a condemnor is entitled to a liberal choice.
The difficulty herein lies in the fact that the DOT has admitted the use of one design that calls for only 66 feet in a segment of the project (Madeira Beach) north of the section at issue and again immediately south of the section at issue (the park area). This certainly belies the "necessity" of the design  and resultant quantity  and renders the decision arbitrary and capricious.
The reason that Florida courts have consistently held that a judicial inquiry is permissible into the necessity of taking stems from their awareness of the "`tunnel vision' that so often plagues a bureaucracy which deems itself immune from judicial review." Chipola, supra, at 360 (concurring opinion). In Central and Southern Florida Flood Control District v. Wye River Farms, Inc., 297 So.2d 323 (Fla. 4th DCA 1974) [cited with approval on other grounds in Griffin] the court held that judicial inquiry is permissible "to protect land owners from abuses of misguided power." 297 So.2d at 326.
Although a "broad discretion" is vested in the condemnor, Inland Waterway Development Co., supra, at 678, and although highhandedness has been held not to constitute bad faith, Chipola, supra, at 359, we hold that the evidence adduced by the DOT was insufficient to withstand the challenge of petitioners' answer and motion to dismiss.
The petition for writ of certiorari is granted and the trial court's order of taking is vacated as to the two parcels involved herein and the cause is remanded for corrective action consistent with this opinion.
BOARDMAN, C.J., and SCHEB, J., concur.
NOTES
[1] "Impass" is the area from curb to curb including the 58 feet for traffic and turning lanes.
[2] There was some indication that the number of spaces lost under the DOT proposal was 14 rather than 18.
[3] The "Red Book" provisions are set out as they actually exist rather than as they appear [incorrectly] in the record.
[4] The curb to curb impass area included 54 feet for traffic and turning lanes.
[5] This case is an example of the problems a property owner faces in condemnation proceedings. The Gulf Boulevard project  hatched in 1959  contained an intricacy of details, particularly in the road right of way design and detail and in division of the project into multiple segments or phases. Most landowners, with their limited knowledge and expertise, can only hope to scratch the surface in uncovering reasons why a project is unnecessary. This momentous burden is made more difficult by the broad discretion granted condemnors.