384 So.2d 916 (1980)
DEPARTMENT OF TRANSPORTATION, Appellant,
v.
William B. BURNETTE et al., Appellees.
No. NN-91.
District Court of Appeal of Florida, First District.
June 11, 1980.
*917 H. Reynolds Sampson, Gen. Counsel, and Margaret-Ray Kemper, Tallahassee, for appellant.
Cary A. Hardee, of Davis, Browning & Hardee, Madison, for appellees.
ROBERT P. SMITH, Jr., Judge.
The Department appeals from a circuit court judgment enjoining it within 90 days either to condemn appellee Burnette's Madison County tract of 100 acres, held unconstitutionally taken without compensation,[1] or to end the water drainage which effected the taking. The trial court found the Department took Burnette's land by draining water down upon it from a point on State Road 10, north of the property, where for years previously pipes and culverts carried drainage in the opposite direction. We find that Burnette failed to prove that the undoubted damage to this land amounts to a taking of it, for which the whole must be condemned and paid for; but we affirm judgment insofar as it enjoins the Department's continued burdening of Burnette's property.
On conflicting evidence the trial court found that the natural drainage path for land immediately surrounding State Road 10 (U.S. Highway 90), within a half-mile *918 west of Madison,[2] was and is northward under the highway and across property now occupied by North Florida Junior College. Years ago drainage was carried under the highway by a clay pipe culvert, which was replaced in 1923 by a larger concrete culvert. In 1956 that section of the highway was rebuilt slightly to the south, and two pipes were placed under the new highway segment to continue draining water from south of the highway northward through the old culvert in the old pattern. Sometime between 1956 and 1969, those northward drainage courses were plugged with concrete, apparently to permit the building of North Florida Junior College, where drainage previously flowed. That action stopped the northward drainage and caused ponding immediately south of the highway. Then, in 1969, the Department completed and systematized the 180° reversal of drainage by ditching an easement from the highway 500 feet south toward the northern boundary of the subject property. During the same project the Department added more drainage to this system through a 416-foot long 54-inch concrete culvert along the south side of State Road 10, which carries the runoff from 103 acres of improved land in municipal Madison.
Appellee Burnette couched his complaint against the Department in terms of a constitutional "taking."[3] The final judgment of the circuit court likewise is predicated on a finding that the diversion of drainage in such substantial quantities "constitutes a permanent taking ... without full compensation."[4] The characteristics of such a "taking" are variously stated by the authorities as "a permanent invasion of land amounting to an appropriation," different in degree or character from "damage to property," and substantially depriving the owner of the land's beneficial use, as contrasted with "merely impair[ing] its use." See Village of Tequesta v. Jupiter Inlet Corp., 371 So.2d 663, 669 (Fla. 1979); Arundel Corp. v. Griffin, 89 Fla. 128, 103 So. 422 (1925); Kendry v. State Road Department, 213 So.2d 23, 27 (Fla. 4th DCA 1968), cert. den., 222 So.2d 752 (Fla. 1969); Elliott v. Hernando County, 281 So.2d 395 (Fla. 2d DCA 1973); Thompson v. Nassau County, 343 So.2d 965 (Fla. 1st DCA 1977); Poe v. State Road Department, 127 So.2d 898 (Fla. 1st DCA 1961); City of Jacksonville v. Schumann, 167 So.2d 95 (Fla. 1st DCA 1964), cert. den., 172 So.2d 597 (Fla. 1965).
There is no doubt that the Department's reversal of the drainage flow from north to south imposes a substantial burden on the subject property. As the trial court said in part, supra fn. 4, the drainage "has interfered with the intended use or uses of the premises." But the question is not whether these 100 acres are damaged or reduced in potential usage, but whether they have been permanently taken. On that issue, the evidence is that half of Burnette's 100 acres are low and relatively more susceptible to collecting water after a heavy rain; half the acreage is high. This evidence is significant *919 because Burnette assembled these 100 acres in order to build "a multi-family type townhouse development" called Country Club Villas, consisting of 376 townhouse units, some with a good view of the Madison Country Club and Golf Course to the west. Burnette wished to build 47 structures, each containing 8 townhouse units and producing a developed density of .29 acres per unit. But, he said, the potential flooding of half his acreage prevents development of Country Club Villas because development standards require construction above the reach of surface water which will rise once every 25 years, on the average, as the result of a "25-year six-hour storm". In such a storm, Burnette's engineer testified, an estimated 14 million gallons of water from the City of Madison will be introduced into the drainage system now including Burnette's land. In such conditions, the 50 low acres will be flooded and access to the 50 acres of high land will be limited. Thus, said Burnette, "I have been advised by my engineer to go no further with the project in any way whatsoever with that 50 acres gone."
Burnette's claim that his 100 acres is unconstitutionally "taken," entitling him to full compensation in the light of the highest and best use of his property, is rendered problematic by the stark fact that Burnette did not own any of this property when, years ago, the drainage system carried surface water across lands to the north now occupied by North Florida Junior College; nor when the old pipes and culverts were plugged, before 1969, and the Department failed to relieve the blockage; nor in 1969, when the Department completed the drainage turnabout, extended it southward, and increased its volume. Burnette did not assemble this potential Country Club Villas until 1977. In May 1972 he bought 25 of these acres from Albert Coody, who previously fished and farmed his property; and in September 1977 Burnette took the remaining 75 acres from Fish and Game Improvement, Inc., a private corporation, in satisfaction of a money judgment which apparently was unrelated to this property.
Appellee Burnette thus assembled the Country Club Villas tract eight years after the Department began the construction which Burnette says effected a taking, and some five years after that construction was completed. Burnette made no investigation of drainage patterns before buying the Coody tract or before accepting title to the Fish and Game Improvement, Inc. tract in satisfaction of a judgment. Burnette's assembly of this 100-acre tract in the face of the circumstances of which he now complains has these countervailing effects upon his claim that, by constitutional standards, his 100 acre tract has been "taken" and he should be wholly compensated for its aggregate value:
First, it appears that this land was permanently "taken," if at all, some years before Burnette assembled it in September 1977. Burnette does not here claim that the 25 acres previously owned by Coody can no longer be used for fishing and farming, as Coody used them, nor that the 75 acre tract cannot now be used for similar purposes, or for whatever purposes (not shown) they were put to all those years, or indeed for low-density residential purposes. The premise for Burnette's claim of a "taking" is that he is unable to develop his 100 acres, conceived of by him as economically indivisible ("I have been advised by my engineer to go no further with the project in any way whatsoever with that 50 acres gone") as a relatively high density "multi-family type townhouse development." Having failed to show that the property is permanently deprived of beneficial uses to which it was put at the time of the acts constituting the taking, Burnette renders inapplicable such decisions as State Road Dept. v. Tharp, 146 Fla. 745, 1 So.2d 868 (1941), in which the Supreme Court liberalized the "taking" test as necessary to protect the owner's entitlement to undiminished use of, or full compensation for, a water mill which had been in use for more than 70 years when Department construction increased the water in the millrace, reducing the mill's capacity by 50 percent. See also Kendry v. State Road Dept., supra, in which the court sustained an inverse condemnation action *920 to protect or to secure full compensation for the taking of land rendered useless for existing residential purposes. Those and other like decisions do not stand for the proposition that governmental action which damages private property by eliminating one of many potential uses, but no existing use, constitutes a permanent taking of that property.
Second, Burnette's premise of an indivisible 100-acre development, the frustration of which constitutes the "taking," is faulty because the two components  a 25-acre parcel and a 75-acre parcel  were separate, not assembled, when the acts constituting the taking occurred and had the permanent effect Burnette contends they had. See Petroleum Products Corp. v. Clark, 248 So.2d 196 (Fla. 4th DCA 1971). To regard those parcels as hypothetically assembled when separately "taken," so enriching every acre of the whole with the potential of its use in a larger, unified tract, violates the familiar principle that it is improper in eminent domain proceedings to speculate on what might be done to make land more valuable, but was not done at the time of taking, and then attribute that greater value to the land so hypothetically improved. Yoder v. Sarasota County, 81 So.2d 219 (Fla. 1955); Coral-Glade Co. v. Board of Pub. Instr. of Dade County, 122 So.2d 587 (Fla. 3d DCA 1960). These lands having been taken, if at all, when they were separate tracts, they cannot be considered as unified for purposes of inquiring whether the injury was such as to constitute a taking.
And third, since the Department acts and omissions affecting the asserted taking occurred before 1972, when Burnette acquired the 25-acre tract, and long before 1977, when he acquired the 75-acre tract, it appears that the asserted taking was not from Burnette at all, but from the two prior owners, Coody and Fish and Game Improvement, Inc. It is they who were deprived of rights in property, if anyone was, and it is to them that the Constitution secures full compensation for the taking. Burnette, the subsequent purchaser and grantee, has no claim in inverse condemnation without assignments of his predecessors' claims, which are not shown here. Marianna & B.R.R. Co. v. Maund, 62 Fla. 538, 544, 56 So. 670, 672 (1911).[5] See also Pinellas Packing Co. v. Clearwater Citrus Growers' Assn., 65 Fla. 340, 61 So. 625 (1913); Florida Power Corp. v. McNeely, 125 So.2d 311, 318 (Fla. 2d DCA 1960). The reason for this rule is as stated by the Minnesota Supreme Court in Brooks Inv. Co. v. City of Bloomington, 305 Minn. 305, 315-16, 232 N.W.2d 911, 918 (1975):
The rationale behind this rule seems to be simple and logical. When the government interferes with a person's right to possession and enjoyment of his property to such an extent so as to create a "taking" in the constitutional sense, a right to compensation vests in the person owning the property at the time of such interference. This right has the status of property, is personal to the owner, and does not run with the land if he should subsequently transfer it without an assignment of such right. The theory is that where the government interferes with a person's property to such a substantial extent, the owner has lost a part of his interest in the real property. Substituted for the property loss is the right to compensation. When the original owner conveys what remains of the realty, he does not transfer the right to compensation for the portion he has lost without a separate assignment of such right. If the rule were otherwise, the original owner of damaged property would suffer a loss and the purchaser of that property would receive a windfall. Presumably, the purchaser will pay the seller only for the real property interest that the seller possesses at the time of the sale and can transfer. In this case that was the real estate less the street unlawfully taken by the city.
*921 In the case before us Burnette acquired the 75-acre tract from Fish and Game Improvement, Inc., in satisfaction of a judgment, long after that property had been deprived (he alleges) of its development potential as an inseparable part of Country Club Villas.
The inverse condemnation remedy for unconstitutional "takings" has been broadened over the years by pressures for relief against State-caused damage or impairment of land use. Although the Supreme Court adheres to the letter of the rule that the Florida Constitution affords no compensation for land damaged and impaired in use, but not permanently encroached upon and taken, Village of Tequesta v. Jupiter Inlet Corp., 371 So.2d 663, 669 (Fla. 1979), decisions emanating from State Road Dep't v. Tharp, supra, have afforded relief where suits previously were thought forbidden by the doctrine of sovereign immunity. Concerning the State's liability to suit for faulty management of surface waters, compare Arundel Corp. v. Griffin, 89 Fla. 128, 103 So. 422 (1925), and Poe v. State Road Dep't, 127 So.2d 898, 901 (Fla. 1st DCA 1961),[6]with Kendry v. State Road Dep't, 213 So.2d 23 (Fla. 4th DCA 1968), cert. den., 222 So.2d 752 (Fla. 1969), and Elliott v. Hernando County, 281 So.2d 395 (Fla. 2d DCA 1973).
Tharp, which is understood as holding that the State unconstitutionally "took" the water mill, though the opinion catalogued other theories of liability including implied contract,[7] and Kendry, which read Tharp as finding the mill was only half damaged, not destroyed, but nevertheless "taken,"[8] reflect the stresses to which "taking" concepts were subjected during years in which sovereign immunity was regarded as barring more direct judicial remedies for damage by the State's drainage trespasses and nuisances. See also Faison v. Division of Administration, Dep't of Transportation, 299 So.2d 629 (Fla. 1st DCA 1974), cert. den., 305 So.2d 201 (Fla. 1974); State Road Dep't v. Darby, 109 So.2d 591 (Fla. 1st DCA 1959). But even as courts became more wont to find that serious damage or impairment of an existing use constitutes a "taking" of property, so justifying judicial intervention, it was plain that the real object of intervening was not to require the State to buy the "taken" land  here, 100 unimproved acres  but was rather, sovereign immunity notwithstanding, to exact damages for the land's loss of utility and value,[9] or to enjoin the State to cease its burdensome conduct.[10]
*922 It is unnecessary in this case that we further attenuate the "taking" concept by finding a (compensable) taking rather than (incompensable) damage, as by holding that this raw acreage is "permanently" appropriated because it is indivisible in Burnette's development scheme and half of it will be flooded by a storm occurring once in 25 years. Burnette's 100 acre tract is not permanently appropriated. Instead it is and will continue to be intermittently and wrongfully damaged by water which the Department casts down upon it in various quantities and intervals, depending on rainfall, by means of a drainage system which reverses the natural and previous flow. The State is properly to be enjoined from continuing this tortious conduct.
It is a simple proposition, whose soundness does not depend upon linkage with inverse condemnation concepts, that "no person has the right to gather surface waters that would naturally flow in one direction by drainage, ditches, dams, or otherwise, and divert them from their natural course and cast them upon the lands of the lower owner to his injury." Brumley v. Dorner, 78 Fla. 495, 501, 83 So. 912, 914 (1919); Dade County v. South Dade Farms, 133 Fla. 288, 296, 182 So. 858, 861 (1938). If the sovereign's immunity was ever a serious impediment to a suit for injunction to secure relief from action by the State having that effect  but see Jones v. Brown, 82 So.2d 889 (Fla. 1955)[11]  it is no longer. Every remedy which would be available against an individual for such a repeated trespass or continuing nuisance, including an injunction to prevent a multiplicity of damage suits, is now available against the State. Section 768.28, Florida Statutes (1979). As for the fact that the statute was not fully effective until January 1975, Chapter 74-235, Fla. Laws, we have held at the Department's urging that it did not previously "take" these 100 acres; certainly we must now correspondingly hold that the Department acquired no prescriptive right, before the legislature's waiver of sovereign immunity, to continue using any part of this acreage as a terminus for the revised drainage system. See Town of Miami Springs v. Lawrence, 102 So.2d 143 (Fla. 1958).
Treating the Department's diversion of drainage as a continuing tort, rather than as a permanent "taking" of all lands affected by it, enables us to sustain the circuit court's injunctive relief notwithstanding that Burnette assembled the subject property long after the Department established the offending drainage pattern. It is no defense to this action, so conceived, that the drainage system was already in place when Burnette bought this acreage and so "came to the nuisance." Lawrence v. Eastern Air Lines, Inc., 81 So.2d 632, 634 (Fla. 1955); Prosser, Law of Torts (4th ed.), Section 91 at p. 611:
The prevailing rule is that in the absence of a prescriptive right the defendant cannot condemn the surrounding premises to endure the nuisance, and that the purchaser is entitled to the reasonable use and enjoyment of his land to the same extent as any other owner, so long as he buys in good faith and not for the sole purpose of a vexatious lawsuit.
Accordingly, the circuit court's judgment is excised of its conclusion, found to be erroneous and unnecessary, that Burnette's 100 acres have been "taken" and must be purchased as in eminent domain; and we shall affirm the judgment which as modified enjoins the Department's continued use of the State Road 10 drainage system in such a way as to burden this land. This is *923 not to say that the Department's use of its eminent domain powers is foreclosed. Quite possibly the Department is unable to restore the old northward drainage pattern without casting unmanageable water on North Florida Junior College. Condemnation of some land or easements may be appropriate to manage this drainage in compliance with the injunction, but the manner and method of so relieving Burnette's land are for the Department to determine in the exercise of its lawful powers. The judgment, as modified, is
AFFIRMED.
ERVIN, J., concurs.
BOOTH, J., concurs in part and dissents in part with opinion.
BOOTH, Judge, concurring in part, dissenting in part:
The judgment below correctly awards the alternative relief prayed and should be affirmed without modification. The majority assumes that the judgment requires the State to condemn the fee in 100 acres, the entire tract owned by plaintiff. Not so. The order enjoins flooding of the tract or, in the alternative, requires institution of condemnation proceedings.[1] What has been determined at this point is that there has been a taking of property with respect to the identified tract of land. The amount of property taken, as well as the value thereof and severance damages, if any, remain to be determined in separate condemnation proceedings should the State so elect.[2] Such proceeding is instituted by the filing of petition and declaration of taking, which determines both the amount of, and estate in, the property taken.[3] The basic principle of eminent domain applies, which requires that the State condemn no more than is necessary for the stated public purpose.[4] Here the majority's decision reaches substantially the same result as the trial court's order, in that it affirms the award of injunctive relief and leaves to the State the option of instituting condemnation proceedings. I concur in that result.
I agree with the majority that the reversal of natural drainage caused by DOT's construction "imposes a substantial burden on the subject property" and that injunctive relief is appropriate. I dissent from the holding that there has been no taking of the property in the constitutional sense and, therefore, no basis for required institution of condemnation awarded as alternative relief. The record shows that the Department of Transportation is responsible for diverting the surface waters drained from 103 acres of the City of Madison, which waters are carried via ditches and culverts constructed by DOT, to be poured onto the land of the plaintiff at the rate of 14 million gallons in a six-hour period during a *924 "25-year" rainstorm.[5] This does not mean, as the majority suggests, that there will be flooding only every 25 years. Even the State concedes the evidence shows some flooding will occur each year. In effect, the storm sewer system of the City of Madison now terminates on plaintiffs' 100-acre tract. The condition of flooding is not permanent in the sense that the water is forever present, but it is permanent in the sense that rain is a condition reasonably expected to occur and reoccur in the future. The evidence is that, without the excess water diverted onto the property, plaintiffs' land is appropriate for residential use.
The trial court's determination that there has been a taking of property is supported by the evidence and in accord with the law of this State. The majority, in rejecting that determination, echoes the dissenting opinion in State Road Department v. Darby, 109 So.2d 591, 593 (Fla. 1st DCA 1957), and rejects the line of cases beginning with State Road Department v. Tharp.[6] The basis for this rejection of prior precedent is that sovereign immunity has been waived, and suits against the State for damages are now available.[7] Suit for damage, an available alternative at the election of the owner for wrongs committed to property, is not a substitute for condemnation, which requires valuation by a 12-person jury without the monetary limitations imposed by Florida Statutes § 768.14 on suits for damages.
The majority holds that plaintiffs' claim in inverse condemnation is "problematical" because he acquired the property after the construction along U.S. 90, which resulted in the diversion of surface waters onto his property. Under the rule cited by the majority, the owner of the property at the time of the taking is entitled to the condemnation award and remains so entitled unless he has expressly assigned the claim to the subsequent owner. This rule was not asserted below nor made an issue on appeal. The record is silent as to the nonexistence of an assignment to the plaintiff. Nevertheless, since the majority bases its holding on the plaintiffs' failure to comply with this rule, it must be pointed out that the rule does not apply in inverse condemnation proceedings in the absence of a showing that the plaintiff and his predecessor in title were aware of the existence of a cause of action at the time title was transferred.[8] Here, it was not until the 1978 drainage study that the change in the natural drainage due to the State's construction along U.S. 90 was discovered. Thus, plaintiff was the owner of the property at the time the injury was revealed and cause thereof discovered. Those cases cited by the majority, which apply the rule to bar recovery by a subsequent purchaser, involve visible construction on the land.[9] Under such circumstances, consideration of the burden or easement is assumed to have been a factor in *925 the purchase price paid, and the purchaser's consent to the continued burden may be implied.
The Department contends that portions of the property were wetlands before construction; and, therefore, the diversion of additional water from the City of Madison onto the property is not a taking. Further, the Department contends that, since the landowner purchased land known to have moist areas and "gambled" that he would be able to drain it for development for residential use, he cannot now complain of the drainage condition. These arguments, which are made in connection with the affirmative defense of laches by the Department, are devoid of merit. The existence of natural water or wet areas on property does not thereby give the Department the right to flood it, nor does it require the landowner to accept millions of gallons of water drained from other lands.[10] Where the activities of the State have rendered the property unfit for residential development and of questionable value for any purpose, present or potential, other than rice paddies, nipa huts or duck ponds, there has been substantial deprivation of property and a taking within the purview of Article X, § 6, Florida Constitution.
I would affirm the judgment below.
NOTES
[1] Article X, Section 6(a), Florida Constitution:

No private property shall be taken except for a public purpose and with full compensation therefor paid to each owner or secured by deposit in the registry of the court and available to the owner.
[2] The beginning point of the offending drainage pattern is described in the judgment as between Stations 735 to 745 on State Road 10 (U.S. Highway 90) as shown on Department maps for Project XXXXX-XXXX, fiscal year 1969.
[3] The amended complaint alleged in part:

6. The diversion of surface waters as described . .. above prevents the Plaintiffs from using their respective property and the action of the Defendant, DEPARTMENT OF TRANSPORTATION, amounts to an actual taking of said real property without paying compensation therefor.
7. The alleged taking of property without compensation served as a substantial ouster depriving Plaintiffs of all beneficial use of the land affected.
8. The taking was permanent in nature.
9. That the heretofore described real property has never been and is not presently the subject of any eminent domain proceeding instituted by the Defendant, or any public body vested with the power of eminent domain under the Laws of the State of Florida.
[4] The court's full finding on the subject was:

That the diversion of surface waters in the quantities described in the testimony has interfered with the intended use or uses of the premises owned by the Plaintiff and constitutes a permanent taking by the DEPARTMENT OF TRANSPORTATION without full compensation.
[5] The Court stated, in Marianna:

In 15 Cyc. [Eminent Domain] p. 795, it is said: "Damages for the taking of land, or for injury to land not taken, belong to the one who owns the land at the time of the taking or injury, and they do not pass to a subsequent grantee of the land, except by a provision to that effect in the deed, or by assignment."
[6] Poe, in language which was in part quoted with approval by the Supreme Court in Village of Tequesta, stated:

... Acts of a public agency in the construction of a public improvement which results in recurrent but temporary flooding of adjacent lands owned by private individuals has been held to be only a consequential damage, and not a taking of the flooded properties within the meaning of the Constitution which prohibits the taking of private property without the payment of just compensation. It is universally recognized that injury by the condemnor to remaining land caused by obstructing, diverting or increasing the flow of surface waters, but which do not amount to a permanent deprivation by the owner of the use of such remaining lands, is a consequential damage resulting from the taking in an eminent domain proceeding, and must be recovered in that proceeding, if at all.
[7] The idea that the State impliedly contracts to pay for its torts was rejected in State ex rel. Division of Administration v. Oliff, 350 So.2d 484 (Fla. 1st DCA 1977).
[8] Kendry, 213 So.2d at 27, said Tharp held that:

... to constitute a taking, the flooding need not completely destroy all value in the property flooded. It will be recalled that the flooding which was the subject of consideration then before the Court merely reduced the mill's capacity by about fifty percent.
This would seem a misreading of Tharp's facts and a corresponding exaggeration of its holding. In Village of Tequesta the Supreme Court stated, 371 So.2d at 669, that the water in Tharp "raised the level of a millrace to such an extent as to destroy the use of plaintiff's grist mill." A half-efficient mill is scarcely better than none.
[9] E.g., Pinellas County v. Austin, 323 So.2d 6, 9 (Fla. 2d DCA 1975): "[T]he Austins are entitled to be compensated for the loss suffered by the vacation of the streets in question."
[10] Although Tharp's principal holding has been read as pertaining to the "taking" of property, not as authorizing injunctions against injurious State modifications of water courses, the principal prayer of Tharp's complaint was for an injunction against the "continual trespass." The Court stated: "In lieu of" injunctive relief, "the defendant was granted the privilege of exercising the right of eminent domain ..." 146 Fla. at 747, 1 So.2d at 869. Subsequent decisions have similarly employed alternative remedies of an injunction to desist or condemn. E.g., State Road Dep't v. Bender, 147 Fla. 15, 2 So.2d 298 (1941); Downing v. Bird, 100 So.2d 57 (Fla. 1958); City of Pompano Beach v. Beatty, 177 So.2d 261 (Fla. 2d DCA 1965).
[11] In Jones v. Brown, through an opinion by Mr. Justice Terrell, the author of Tharp and other decisions expanding the "taking" concept, the Supreme Court, without troubling to invoke "taking" concepts, sustained an injunction against the State's drainage system notwithstanding a plea of sovereign immunity.
[1] Final Judgment, in part:

ORDERED and ADJUDGED that the prayer for a restraining order against the DEPARTMENT OF TRANSPORTATION, STATE OF FLORIDA, is hereby granted and the Defendant, DEPARTMENT OF TRANSPORTATION, is enjoined and restrained from allowing surface waters to flow onto the real property belonging to the Plaintiff, WILLIAM M. BURNETTE... .
ORDERED and ADJUDGED that the DEPARTMENT OF TRANSPORTATION OF STATE OF FLORIDA is hereby Ordered to immediately begin condemnation proceedings of the real property owned by WILLIAM M. BURNETTE which is more particularly described as follows:
... . [description of entire tract]
Further ORDERED and ADJUDGED that the DEPARTMENT OF TRANSPORTATION, STATE OF FLORIDA, is hereby granted ninety (90) days from the date hereof to comply with this Final Judgment either by commencing condemnation proceedings or by changing the course of said surface waters pursuant to the restraining order above.
[2] State Road Department v. Harvey, 142 So.2d 773, 775 (Fla. 2d DCA 1962); State Road Department v. Darby, 109 So.2d 591, 593 (Fla. 1st DCA 1959).
[3] Florida Statutes, §§ 73.021, 74.031 (1979); Tosohatchee Game Preserve, Inc. v. Central and Southern Florida Flood Control District, 265 So.2d 681 (Fla. 1972).
[4] Canal Authority v. Miller, 243 So.2d 131 (Fla. 1970); Ball v. City of Tallahassee, 281 So.2d 333 (Fla. 1973); Knappen v. DOT, 352 So.2d 885 (Fla. 2d DCA 1977).
[5] A storm occurring with "average frequency" every 25 years. Residential design criteria and "ponding" requirements are based on the amounts of rainfall generated within a six-hour period during such a storm.
[6] 146 Fla. 745, 1 So.2d 868 (1941); Kendry v. State Road Department, 213 So.2d 23 (Fla. 4th DCA 1968), cert. denied 222 So.2d 752 (Fla. 1969); Thompson v. Nassau County, 343 So.2d 965 (Fla. 1st DCA 1977); Pinellas County v. Austin, 323 So.2d 6 (Fla. 2d DCA 1975); Elliott v. Hernando County, 281 So.2d 395 (Fla. 2d DCA 1973); City of Jacksonville v. Shumann, 167 So.2d 95 (Fla. 1st DCA 1964); State Road Department v. Darby, 109 So.2d 591 (Fla. 1st DCA 1959).
[7] This idea is not original. See, e.g. Kermetz v. Cook-Johnson Realty Corp., 54 Ohio App.2d 220, 376 N.E.2d 1357 (1977).
[8] Cox Enterprises v. Phillips Petroleum, 550 P.2d 1324 (Okl. 1976); See, 6A Nichols, Eminent Domain, § 28.3 at 28, 89, 90 (3d Ed. 1979); 27 Am.Jur.2d, Eminent Domain, § 501 at 457.
[9] Brooks Investment Co. v. City of Bloomington, 305 Minn. 305, 232 N.W.2d 911 (1975) (street illegally constructed across land prior to sale of property, held owner at time of construction rather than subsequent owner entitled to recover); Marianna & B.R. Co. v. Maund, 62 Fla. 538, 56 So. 670 (1911) (railroad track laid across land without compensation, held suit dismissed without prejudice were assignment of claim to subsequent owner was attained after suit filed.
[10] 2A, Nichols, Eminent Domain, § 6.4441[8], in part:

[A] system of drainage collecting surface water from the streets of an entire section of a city and turning it by artificial channels upon private land to which it would not naturally have flowed could not be constructed without compensation to the owner of the land affected. Such an injury would not reasonably be contemplated when the street in front of such land was laid out, ... and ... would be such a severe and direct invasion of property as to constitute a taking in the constitutional sense.