LAWRENCE, J.
Ferris G. Millender, his wife Margaret Millender, and Millender & Sons Seafood Company, Incorporated (Millender) appeal a final judgment holding an action for inverse condemnation and injunctive relief barred by the statute of limitations. We reverse.
The Florida Department of Transportation (DOT), in 1975, rerouted the river channel in the Carrabelle River in Franklin County, in order to build the new Tillie Miller Bridge. Millender, located within blocks of the bridge, found his property eroding. Millender’s initial efforts to retard erosion, including the construction of a sea wall, were successful but, after eight years of litigation with another state agency[1] ending in 1993, Millender was forced to remove the seawall. Millender, as erosion continued,[2] in 1993 sued DOT for in-junctive relief, full compensation, and damages.
The trial court determined that Millen-der’s 1993 action against DOT was barred by the statute of limitations. Millender appeals and the parties argue two issues: (1) whether the trial court erred in failing to apply the continuing tort theory; and (2) whether the trial court erred in failing to apply the federal Dickinson doctrine.[3]
The court below, as fact finder, found that: “In 1975 in conjunction with replacing the Tillie Miller Bridge the Defendant, Department of Transportation, realigned the navigational channel of the Carrabelle River from the north side of Davis Island to the south side of Davis Island causing erosion to [Millender’s] property.” The *769 court held, as a matter of law, that Millen-der’s action for inverse condemnation and injunctive relief was barred by the statute of limitations. We reverse based on both the continuing tort theory and the Dickinson doctrine, either of which warrants reversal.

The Continuing Tort Theory

This court, in an action for inverse condemnation and injunctive relief, has recognized the vitality of the continuing tort theory. Department of Transp. v. Burnette, 384 So.2d 916 (Fla. 1st DCA 1980) (affirming in part and reversing in part, and holding that where the land in question was permanently taken by flooding, if at all, some years before the owner-claimant assembled it, the owner had no claim in inverse condemnation without assignments of his predecessors’ claims; the state was properly enjoined from continuing its tortious conduct of diverting natural drainage onto the owner’s property; and the department acquired no prescriptive right to continue using any part of the owner’s property as a terminus for a revised drainage system). The court said:
Treating the Department’s diversion of drainage as a continuing tort, rather than as a permanent “taking” of all lands affected by it, enables us to sustain the circuit court’s injunctive relief notwithstanding that Burnette assembled the subject property long after the Department established the offending drainage pattern.
Id. at 922 (emphasis added). This language means that the continuing tort against Millender may be redressed by way of injunctive relief.
We know furthermore that the statute of limitations, in a continuing tort action, runs from the time of the last tor-tious act. Halkey-Roberts Corp. v. Mackal, 641 So.2d 445, 447 (Fla. 2d DCA 1994) (“We also note that the granting of summary judgment as to counts I and II in their entirety was error because several of the complained-of acts are alleged to have occurred within four years preceding the filing of the complaint.”), cited with approval in Pearson v. Ford Motor Co., 694 So.2d 61 (Fla. 1st DCA 1997). Millender’s action thus is timely.

The Dickinson Stabilization Doctrine

The United States Supreme Court holds that the statute of limitations for an inverse condemnation begins to run from the time “the situation becomes stabilized.” United States v. Dickinson, 331 U.S. 745, 749, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947) (affirming awards to landowners for a governmental taking). The high court explains:
The Government could, of course, have taken appropriate proceedings, to condemn as early as it chose, both land and flowage easements. By such proceedings it could have fixed the time when the property was ‘taken.’ The Government chose not to do so....
.... If suit must be brought, lest he [the claimant] jeopardize his rights, as soon as his land is invaded, other contingencies would be running against him—for instance, the uncertainty of the damage and the risk of res judicata against recovering later for damage as yet uncertain. The source of the entire claim—the overflow due to rises in the level of the river—is not a single event; it is continuous. And as there is nothing in reason, so there is nothing in legal doctrine, to preclude the law from meeting such a process by postponing suit until the situation becomes stabilized. An owner of land flooded by the Government would not unnaturally postpone bringing a suit against the Government for the flooding until the consequences of inundation have so manifested themselves that a final account may be struck.
When dealing with a problem which arises under such diverse circumstances procedural rigidities should be avoided. All that we are here holding is that when the Government chooses not to *770 condemn land but to bring about a taking by a continuing process of physical events, the owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really ‘taken.’
Id. at 747-49, 67 S.Ct. 1382 (emphasis added). Millender likewise should not be required to bring piecemeal actions; he justly waited until the consequences of state agency action “so manifested themselves that a final account may be struck.” Id. at 749, 67 S.Ct. 1382. The “final account” in the case at bar could be struck only when another state agency prevented Millender from protecting his buildings from falling into the river.
DOT nevertheless argues that this federal doctrine cannot be applied in Florida because as yet no Florida court has applied it; this argument is incorrect. The fact that a sound federal doctrine has yet to be employed in state law is no bar to its application in an appropriate case. A Florida district court of appeal moreover has cited, with approval, the federal case, and applied the Dickinson reasoning to affirm an inverse condemnation. See Hillsborough County Aviation Auth. v. Benitez, 200 So.2d 194 (Fla. 2d DCA 1967) (affirming the trial court’s judgment of inverse condemnation, citing United States v. Dickinson). The court said:
[W]e are asked if appellant has a prescriptive right of flight over appellees’ property.
It has been said that there is no single test for discovering in all cases when an avigational easement is first taken by overflights. Some annoyance must be borne without compensation. The point when that stage is passed depends on a particularized judgment evaluating such factors as the frequency and level of the flights, the type of planes, the accompanying effects such as noise or falling objects, the uses of the property, the effect on values, the reasonable reactions of the humans below, and the impact upon animals and vegetable life....
[Pjlaintiffs then knew their use of their properties had been and would continue to be seriously impaired by the flights of these planes. Before that time they were uncertain just how serious the impairment would be or how long it would continue. Before that time we do not think the statute of limitations had begun to run and, hence, plaintiffs’ petitions are in time. Cf. United States v. Dickinson, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789.
In the instant case the able Chancellor found that it was not until May of 1960 that the first pure jet flew into Tampa International Airport. We adopt his finding and note that appellees commenced their action against the Authority in early 1964. The record discloses that during a four month period from April through July, 1965, there were approximately eight hundred (800) landings and take-offs of jet aircraft over or near appellees’ properties and that as high as forty-four of these had occurred on a single day.
We hold, therefore, that at some time after May of 1960 there was a substantial interference with appellees’ use and enjoyment of them properties.
Id. at 199-200 (emphasis added). We, like the Benitez court, find the application of the federal doctrine in the state context appropriate.
DOT nevertheless relies on Nadler Foundry & Machine Co. v. United States, 143 Ct.Cl. 92, 164 F.Supp. 249 (1958) (dismissing the plaintiffs petition for government reimbursement of the cost of building a bulkhead, and holding that where an extensive cave-in of the plaintiffs land occurred in 1934 and the plaintiff built a bulkhead in 1935 in an unsuccessful effort to prevent a further cave-ini indicating that the plaintiff was at that time aware of what would happen to the land in the course of time, the landowner’s action against the government, commenced in 1954, was barred by the six year statute of *771 limitations, even if the government’s dredging action prior to 1934 was the cause of cave-in). The Nadler court said:
We think the plaintiff would carry the Dickinson doctrine too far. As this Court said in Columbia Basin Orchard v. United States, 88 F.Supp. 738, 739, 116 Ct.Cl. 348, 357, the Dickinson doctrine does not permit a plaintiff to wait ‘until any possibility of further damage (has) been removed.’ In the instant case when, before 1931, the water had practically reached the bottom of the steep bank sloping up to the upper level land, the ultimate cave-in of that land was a foreseeable future event. In 1934 there was an extensive cave-in, and the caving process was continuous from that time. If the upper level land was to be saved, a bulkhead had to be built. An ineffective one was built in 1935, which showed that the plaintiff was then aware of what would happen to the land in the course of time.
The very same suit, on the same grounds and for the same damages, could have been brought by the plaintiff at least as long ago as 1934. If it had been brought at that time, questions of fact the solution of which is difficult on the present record would or might have been easier to solve. The purpose as well as the period of the statute of limitations argue against the plaintiff.
Id. at 251 (emphasis added). Nadler is inapposite: Millender, rather than waiting “until any possibility of further damage (has) been removed,” brought the instant action when the unforeseeable “future event” happened — when another state agency prevented him from protecting his property with a sea wall.[4] Millender’s cause of action then accrued. Dickinson, Benitez. Millender filed his action that same year. The trial court thus erred in concluding that Millender’s action is barred by the statute of limitations.
We nevertheless certify a question of great public importance:
DOES THE DOCTRINE STATED IN UNITED STATES V. DICKINSON, 331 U.S. 745[, 67 S.Ct. 1382, 91 L.Ed. 1789] (1947), APPLY IN AN APPROPRIATE FLORIDA CASE SO AS TO DELAY THE ACCRUAL OF AN ACTION FOR INVERSE CONDEMNATION AND INJUNCTIVE RELIEF?
Because Millender timely instituted an action for inverse condemnation and in-junctive relief, we reverse the final judgment under review, certify a question, and remand the cause for consistent proceedings.
JOANOS and VAN NORTWICK, JJ„ CONCUR.

. The Florida Department of Environmental Protection.

. Millender had been operating a seafood business on his property since 1944. Millen-der, in a 1994 deposition, described the damage: "Our property is vanishing, going in the river, washing down the river. Our docks is torn down, our buildings is falling in, our ice plant is falling in, our freezer fell in. And this building — new building we built 17 years ago is falling, half of its done fell.”

. United States v. Dickinson, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947).

. State agents, after the hurricane of 1985, came to Franklin County and issued on-site permits to put in sea walls; the Millenders secured a loan and put in a sea wall; after the wall was completed, which took a year, a state agency cited Millender for a violation, beginning litigation that ended in an order to take down the sea wall. After the removal of the sea wall, the Millenders' buildings began falling into the river.